# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**HYDROPROCESSING ASSOCIATES, LLC**                                          **PLAINTIFF**

**v.**                                                                                   **1:19CV336-LG-RHW**

**GARLON M. MCCARTY, ET AL.**                                               **DEFENDANTS**

## ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION

THIS MATTER came before the Court for a hearing on Plaintiff's [14] Amended Motion for Temporary Restraining Order and Preliminary Injunction on July 26, 2019. Plaintiff seeks an injunction requiring Defendants, each a former employee, to comply with the non-compete and non-recruitment clauses in their employment agreements. Following the hearing, the parties were allowed to submit closing briefs. After due consideration of the evidence produced at the hearing, the parties' arguments and the relevant law, it is the Court's opinion that Plaintiff has carried its burden to show that it would be irreparably harmed if Defendants Garlon McCarty and Andrew Russell are not enjoined from violative activities. The Motion will be denied as to the remaining Defendants.

## BACKGROUND

Plaintiff Hydroprocessing Associates, LLC ("HPA") is a contractor that provides highly specialized technical services and mechanical work to, among others, Chevron Corporation in Pascagoula. The eight defendants are individuals who previously worked for HPA, but now work for a competitor. Garlon McCarty is

alleged to have been the ringleader, leaving HPA to work for the competitor and recruiting the other seven defendants. All Defendants signed employment agreements that contain non-competition and non-recruitment clauses. HPA seeks only an order under Fed. R. Civ. P. 65 enjoining Defendants from violating the non-competition and non-recruitment clauses in their employment agreements.[1] Specifically, HPA wants Defendants enjoined from:

    a. contacting or soliciting HPA's clients, including Chevron, for the remainder of their respective 12-month non-competition periods;

    b. except as to Defendant Higgins, providing, or assisting others in providing, products or services that compete with HPA to HPA's clients, including Chevron; and

    c. directly or indirectly soliciting for employment, hiring, participating in the recruiting or hiring of, or going into business with HPA's employees.

    Defendants argue that 1) the non-competition provisions are unduly oppressive and greater than necessary to protect HPA's business interests, rendering them unreasonable; and 2) HPA will suffer only loss of business income, which does not constitute irreparable injury.

    During the pendency of the injunction motion, the Court entered an [12] Order requiring the parties to maintain the status quo, which remains in effect until entry of this order resolving HPA's motion for injunctive relief.

---

1. HPA no longer seeks injunctive relief against Defendants Robert Barnett, Mitchell Jones, Justin Storer or Zachery Storer. (HPA Post-Hrg. Brief 2 n.1, ECF No. 34.)

## DISCUSSION

### A. The Legal Standard

To obtain a preliminary injunction, the applicant must show: (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to the party whom the applicant seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. *Lake Charles Diesel, Inc. v. Gen. Motors Corp.* 328 F.3d 192, 195-96 (5th Cir. 2003). The Fifth Circuit has "cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Id.* at 196 (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)).

### B. Findings of Fact

The services HPA provides for oil refineries are "turnkey," meaning HPA provides all services that a refinery could require related to its catalysts, including installing blinds, removing exchangers, and mechanical services. (Tr. 22:7-25, ECF No. 31.) HPA also has the capability to handle mechanical work with exchangers and equipment and machinery outside catalyst work, and HPA has handled that work for Chevron Corporation in the past. (*Id.* at 23:20-23; 45:17-20, 23-24; 54:11-21; 55:1-3.)

HPA is headquartered in Moss Point, Mississippi. (*Id.* at 23:1-3.) While HPA has offices elsewhere, and while HPA does work in other locations, HPA does most of its work at Chevron's refinery in Pascagoula, Mississippi. (*Id.* at 23:12-17.) Since 2007, HPA has had a close relationship with Chevron. (*Id.* at 29:11-25.) This relationship – and HPA's safety and performance record – led Chevron to designate HPA as a preferred vendor, meaning HPA did not have to bid for Chevron work and simply submitted projections instead. (*Id.* at 29:11-25; 33:4.)

HPA's preferred vendor status at Chevron was partly due to Defendant Mike McCarty's role as HPA's go-to guy. (*Id.* at 27:3-6; 139:18-20.) McCarty had been with HPA for 12 years and was "the face" of HPA at the Chevron refinery (*id.* at 27:3-6; 109:21-25), overseeing all operations there as HPA's Operations Manager (*id.* at 65:17). McCarty had intimate knowledge of HPA's equipment and patented technology (*id.* at 26:23 – 27:13), HPA's operations and staffing (*id.* at 26:23 – 27:13; 134-135), and HPA's costs for bidding and what it took to do the work (*id.* at 27:7-16.) McCarty was responsible for preparing projections and estimates for customers, including Chevron. (*Id.* at 27:9-13.)

HPA knew that its relationship with Chevron relied on the leadership team McCarty had built and trained. (*Id.* at 30:13-18.) HPA's work requires around 50 employees (*id.* at 61:7-14), but McCarty's "crew" made up the leadership that was consistently called for every job at the Chevron refinery. (*Id.* at 52:1-4.) McCarty's crew consisted of each Defendant, except Andrew Russell:

• Justin Higgins was McCarty's "right-hand person" as HPA's Project Manager, who was a key client contact that communicated directly with

Chevron's impact-team leaders. (*Id.* at 22:21-23; 93:8-11; 94:1-8.)

• Harry O. Ridgdell was HPA's Lead Supervisor and another "go-to guy" for HPA's customers. (*Id.* at 94:1-8.) As the Lead Supervisor, Ridgdell ran the whole job (*id.* at 174:12-15) and himself oversaw the Lead Top Supervisor and Lead Ground Supervisor. (*Id.* at 94:1-8.)

• Robert Barnett was a Lead Top Supervisor, who supervised all work at the top of the reactor. (*Id.* at 93:12-17.)

• Mitchell Jones was a night-shift supervisor. (*Id.* at 94:11-12.)

• Justin Storer served as a supervisor, depending on the workload. (*Id.* at 94:14-15.)

• Zackery Storer served as a catalyst technician. (*Id.* at 94:17-25.)

Having leadership like McCarty's crew is crucial to getting Chevron's work. (*Id.* at 32:4-5.) Chevron gives work to "familiar faces" with experience and a good work history. (*Id.* at 30-31.) McCarty's crew filled that role for Chevron and were approved by Chevron time and time again. (*Id.* at 30:13-18.)

Stronghold Specialty, Ltd. ("Stronghold") "is a holding company consisting of three specialty companies that work in tandem to provide the refining and petrochemical industry" services. Under its umbrella are sister companies Cat-Spec, Ltd. ("Cat-Spec") and Elite Turnaround Specialist, Ltd. ("ETS"). (*Id.* at 16:20-22.) Like HPA, Cat-Spec is a turn-key contractor for catalyst work, and "[n]obody disputes that Cat-Spec competes with HPA." (*Id.* at 14:20-21; 67:11-14.)

ETS is a contractor for mechanical work for equipment other than reactors, such as exchangers, drums, and columns. HPA has done this same work in the past, although the parties contest the frequency and extent. (*Id.* at 45:17-20; 45:23-24; 54:11-13; 54:16-21;55:1-3.) Cat-Spec and ETS work together to provide

comprehensive services to a refinery, and where Cat-Spec works, so does ETS. (*Id.* at 68:12-18.) Cat-Spec and ETS work for Chevron outside Mississippi and compete with HPA for Chevron work in other states. (*Id.* at 139:1-5; 163:8-9.) But to date, these Stronghold companies have yet to work at Chevron's Pascagoula refinery. (*Id.* at 138:23-25.)

In December 2018, McCarty began looking for work elsewhere. McCarty first applied for a job at HPA's competitor USA DeBusk—a catalyst contractor—and he was offered the job. (*Id.* at 100:2-3; 137:16-21.) But Defendant Andrew Russell set up a meeting between Russell, McCarty, and Stronghold that took place in January 2019 to discuss McCarty working for Cat-Spec. (*Id.* at 101:2-10; 102:5-6.) McCarty attended this meeting, as well as a second that same month between him and Stronghold. (*Id.*) At the second meeting, McCarty was offered a job at Cat-Spec. (*Id.* at 138:16-18.) McCarty turned it down, but accepted employment with ETS instead. (*Id.* at 138:18.) HPA employee and McCarty's friend Tommy Bradford testified that McCarty was intentionally placed with ETS to get around the noncompetition clause in his Agreement. (*Id.* at 102:20-25; 103:1-7.)

McCarty left HPA for ETS on February 7, 2019. (*Id.* at 98:6-10.) When Russell helped McCarty get a job with ETS, Russell was still HPA's Chief Operating Officer, but he eventually resigned to work at Cat-Spec on April 30, 2019. (*Id.* at 80:12-13; Guy-Irby Dep. 29:18-20, ECF No. 28-8.)

Before McCarty left HPA, he and Higgins prepared HPA's proposal (the "SOFA") for the Chevron 81B Module turnaround, then scheduled for August 2019.

(Tr. 32:17-33:5; 72:7-10, ECF No. 31.)  After McCarty and Russell left, Chevron personnel advised Doug McDaniel – HPA's new Chief Operating Officer – that it intended to competitively bid the work.  Chevron explained that Russell and McCarty's departures made Chevron doubt HPA's stability, and Chevron had heard more defections were imminent and therefore was "terribly concerned . . . ."  (*Id.* at 32; 35:6-19; 36:18.)  McDaniel held a meeting on or about June 19, 2019 with Defendants Higgins and Ridgdell, among others. (*Id.* at 37:8-11.)  McDaniel asked if they intended to resign, advising that, if they did, it would "bring this company to its knees" and put HPA "out of business."  (*Id.* at 38:6-10.)  Like a "domino effect," these employees confirmed they were leaving and resigned that day, along with Defendants Jones, J. Storer, and Z. Storer.  (*Id.* at 58:1-11; 74:7-10.)  Barnett left days later.  (*Id.* at 39:1-6.)  At the same time, Chevron personnel alerted McDaniel that Cat-Spec had submitted a competing proposal for the 81B Module, that McCarty had been in the refinery bidding work on the 81B Module (*id.* at 48:24 – 49:1), and he "look[ed] at the reactor turnarounds, that was the package that was given to [Chevron]."  (Id. at 69:11-14.)

Chevron personnel told Richard Lawson—HPA's General Manager—the same, giving him a sign-in sheet showing that McCarty had visited the Pascagoula refinery.  (*Id.* at 69:22-25; 74:20 – 75:1-3; 75:20; 76:10.)  These Chevron personnel advised Lawson that Chevron knew that HPA's "core group ha[d] left," that Chevron "like[d] to see familiar faces," and that Chevron intended to accept bids from others as a result.  (*Id.* at 71:5-10.)  Chevron also returned HPA's SOFA,

advising that the projections were identical to Cat-Spec's SOFA, but that the manpower projections were different. (*Id*. at 41:8-19.) Chevron pointed out that McCarty had submitted both SOFAs, putting the differing projections in doubt and requiring HPA to submit a revised SOFA for less revenue. (*Id*. at 71:18-24, 72:7-17; 84:20-24; 85:25-86:6.)

HPA then learned that both McCarty and Russell had been recruiting current and former HPA employees during this time. This included the "essential or key personnel" on McCarty's crew. (*See id*.at 95:1-2.) For example, McCarty contacted Barnett while he was still at HPA and talked with him about working for Cat-Spec and ultimately got him that job. (*Id*. at 123:3-4; 141:7-16.) Lawson—a current HPA employee – testified that Russell called him as an accident, thinking he was reaching Higgins. (*Id*. at 80:18-25, 81:1-7.) Russell called back, spoke with Lawson, and began inquiring about his pay, hinting that "life goes on after HPA." (*Id*. at 81:11-25.) McCarty admitted at the hearing that he called the HPA employees who had left to help them find work with Cat-Spec or ETS. (*Id*. at 122:11-13.) Ridgdell had also been contacted by Cat-Spec while he was still with HPA and was offered a job. (*Id*. at 179:1-2.) Ridgdell asked if he could bring "his" people with him, and he was told Cat-Spec needed all the people it could find. (*Id*. at 179:4-5.) So like McCarty and Russell, Ridgdell also began recruiting HPA employees and did so before he left HPA. (*Id*. at 179:5-7; 181:16-22.)

McCarty and Russell organized a meeting at the Los Ranchos Fuentes restaurant in Lucedale, Mississippi to continue recruiting. McCarty testified that

the meeting was arranged the day the Defendants and others resigned from HPA. (*Id.* at 144:18-22-25, 145:1-3.) But Guy-Irby—a new Cat-Spec employee—testified that McCarty had planned the meeting and had her arrange the logistics. (Guy-Irby Dep. 76:11-17.) McCarty sent out an invitation by text message to the Defendants and others, advising them not to share or forward the message. (Tr. 144, ECF No. 31.) The purpose of the meeting was to hire former HPA employees for Cat-Spec and discuss titles, pay rates, and benefits. (Guy-Irby Dep. 80:15-21.)

At the meeting, prospective employees sat in a separate room and – one-by-one – met with Guy-Irby, McCarty, Higgins, and Russell, all seated together. (Tr. 78:1-3, ECF No. 31.) Both McCarty and Russell were discussing recruitment with these prospective employees (Guy-Irby Dep. 87:19-23), and Russell admits that he was there to discuss the candidate's skill set, potential positions with Cat-Spec, and pay. (Tr. 157:13-17.)

Shortly thereafter, HPA filed this lawsuit and the Court entered its order requiring the parties to maintain the status quo. Russell nevertheless went ahead with a closing on real property in Lucedale, Mississippi. He purchased the property through a company in which he has personal ownership, and it is intended for use as a shop and office for the Stronghold companies. (*Id.* at 167:12-24.) Additionally, McDaniel was told by his supervisors that despite the status-quo order, Russell has been calling HPA's new trainees – hired to replace the Defendants – to recruit them to Cat-Spec and making "pretty power[ful] offers." (*Id.* at 63:2-8.)

## C. The Elements of Injunctive Relief

### 1. *Substantial Likelihood of Prevailing on the Merits*

Mississippi law on non-competition agreements holds that they are valid only "within such territory and during such time as may be reasonably necessary for the protection of the employer or principal, without imposing undue hardship on the employee or agent." *Empiregas, Inc. of Kosciusko v. Bain*, 599 So. 2d 971, 975 (Miss. 1992). A non-competition agreement that is not limited as to duration or location is unreasonable and invalid. *Easy Reach, Inc. v. Hub City Brush, Inc.,* 935 So.2d 1140, 1143 (Miss. Ct. App. 2006).

Mississippi courts have upheld non-competition provisions such as those at issue here on the basis that an employer has an interest in the protection of its customer base, its goodwill, and its ability to succeed in a competitive marketplace. *Bus. Commc'ns, Inc. v. Banks*, 91 So. 3d 1, 10 (Miss. Ct. App. 2011) (citing *Empiregas*, 599 So. 2d at 976). "The primary right of the employer is that of 'protecting the business from loss of customers by the activities of the former employees who have peculiar knowledge of and relationships with the employer's customers.'" *Herring Gas Co. v. Magee*, 813 F. Supp. 1239, 1245 (S.D. Miss. 1993) (quoting *Redd Pest Control Co., Inc. v. Heatherly*, 157 So. 2d 133, 136 (Miss. 1963)). Covenants not to compete are valid and enforceable if they protect an employer's investment in the training and education of an employee. *Redd Pest Control Co., Inc. v. Foster*, 761 So. 2d 967, 973 (Miss. Ct. App. 2000); *Taylor v. Cordis Corp.*, 634

F. Supp. 1242, 1247-49 (S.D. Miss. 1986); *Texas Rd. Boring Co. of La.-Miss. v.*

*Parker*, 194 So. 2d 885, 889 (Miss. 1967); *Heatherly*, 157 So. 2d at 136.

> Such covenants may be used to protect confidential information, trade secrets, proprietary information, customer lists, vendor relationships, business practices, and the employer's investment in training and education of an employee. The employee may not simply take such information to a competitor. Mississippi courts have enforced covenants not to compete when former employees who, like Banks, have peculiar knowledge of and relationships with the employer's customers and vendors.

*Bus. Commc'ns*, 91 So. 3d at 11 (citing *Herring Gas*, 813 F. Supp. at 1245).

HPA argues that it is likely it will prevail on the merits of its request for injunctive relief because Defendants' employment agreements contain valid and enforceable non-competition and recruitment provisions which are reasonable in duration and scope. HPA asserts that the provisions are necessary to protect its customer relationships and its investment in employee training and education. Defendants contend in opposition that the provisions impose undue hardship on them, because they are forced to seek work outside of Mississippi after leaving HPA's employ.

The relevant provisions read

**13. NON-COMPETITION**

13.1    For 12 months after Employee's Termination Date (without regard to whether Employee's termination is voluntary or involuntary), the Employee will **not** (on the Employee's behalf or on behalf of any other person or entity), either directly or indirectly, in person or through someone acting on the Employee's behalf or at Employee's direction:

- Contact or solicit a Covered Client for the purpose of encouraging such Covered Client to discontinue its business relationship with HPA or otherwise modify its business relationship to HPA's detriment, and/or directly or indirectly suggest to such Covered Client that the Covered Client obtain a Competitive Product or Service from the Employee's new employer or from any company other than HPA, its subsidiaries, or an Affiliate.

- Provide, or assist any other person or entity in providing, a Competitive Product or Service to a Covered Client.

**14. HIRING COMPANY PERSONNEL**

14.1    The restrictions contained in this section shall apply during the time Employee is employed by HPA (or an Affiliate) and for the 18-month period following the Termination Date.

14.2    During the period described in the preceding sentence, except to the extent that Employee is still employed HPA and acting with HPA's approval, the Employee shall not, either directly or indirectly, solicit for employment, hire, participate in the recruiting or hiring of, or go into business with any person who meets the definition of "Company Personnel." For employees

The Court finds the provisions at issue to be valid and enforceable under Mississippi precedent.  First, the twelve to eighteen-month durations of the non-competition/recruitment provisions above are reasonable as a matter of law.  *See Bus. Commc'ns*, 91 So. 3d at 11 n.1 (collecting cases approving durations of two to five years); *Union Nat. Life Ins. Co. v. Tillman*, 143 F. Supp. 2d 638, 643 (N.D. Miss. 2000) (approving duration of one year).  Second, the limitation of "covered client" makes the location of the non-competition clause reasonable, because the set of persons or entities subject to the restriction is readily definable.  *See Advanced Solutions Network, Inc. v. Gill*, No. 1:12cv250-LG-JMR, 2013 WL 5278201, *6 (S.D. Miss. Sept. 18, 2013).   The only "covered client" in Mississippi is Chevron.

Finally, although the provisions impose hardship on former employees, it is not "undue" hardship. Courts have found no undue hardship where a former employee would be required to move outside of a restricted geographical area in order to provide competing services. *See e.g., Bus. Commc'ns*, 91 So. 3d at 11. The work at HPA was project-based, and therefore involved time during which Defendants did not work, engaged in make-work, or traveled to other parts of the country for work. Defendant Ridgdell testified that travel for work at other refineries was part of his job at HPA, although he often chose not to travel for work assignments in other locations. (Tr. 191-92, ECF No. 31.) Further, work at the Pascagoula Chevron facility is not strictly off limits – it is providing competing services that is prohibited. HPA Chief Operating Officer McDaniel testified that non-competing work at the Chevron facility is available to Defendants because "a lot of these guys here are jam-up welders, they're good boilermakers, yes, outside of just putting catalysts in a reactor." (Tr. 57, CF No. 31.) The Court accordingly finds no undue hardship on former employees.

Application of the non-competition provisions to the facts clearly shows breaches of the provisions by McCarty, Russell, and Ridgdell who, at the least, assisted "company personnel" in obtaining employment with an HPA competitor. And although Defendants stress the difference between ETS and Cat-Spec, the testimony showed that there may be no real distinction between the two. The restaurant recruitment event is an example, as it was conducted by Cat-Spec and ETS personnel who were offering jobs at Cat-Spec.

The difficult question is whether the damage has already been done, or if there is some utility to enjoining Defendants from further efforts to compete or recruit. HPA argues that Defendants were actively violating their non-compete agreements at the time this lawsuit was filed. It required the Court's status quo Order to halt this activity, and there was testimony that Russell continued to recruit HPA employees after the status quo Order went into effect. Additionally, Russell testified that after the status quo Order went into effect, a company he owned purchased land in South Mississippi for an office for ETS and, probably, Cat-Spec. (Tr. 167:12-24.) Defendants make no argument that they intend to abide by the terms of their employment agreements in the future, although the Defendants who testified indicated that they made efforts to comply after entry of the status quo Order.

A "court's power to grant injunctive relief survives discontinuance of the illegal conduct," and because the "purpose . . . is to prevent future violations," injunctive relief is appropriate when there is a "cognizable danger of recurrent violation, something more than the mere possibility." *United States, v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). "Changes made by defendants after suit is filed do not remove the necessity for injunctive relief, for practices may be reinstated as swiftly as they were suspended." *Gates v. Collier*, 501 F.2d 1291, 1321 (5th Cir. 1974). Once a violation is demonstrated, all that need be shown is that "'there is some reasonable likelihood of future violations,'" and past unlawful conduct is "'highly suggestive of the likelihood of future violations.'" *U. S. Dep't of Justice v.*

-14-

*Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015) (quoting *Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).

The Court finds that the particular circumstances of this case compel issuance of a preliminary injunction as to Andrew Russell and Garlon McCarty. Testimony indicated that Russell continued to recruit HPA employees just days before the hearing and take steps to assist his new employer in competing against HPA. Further, because the bid process for the work at the Pascagoula Chevron facility is ongoing, and McCarty may be involved in that process on behalf of HPA's competitor, he also should be enjoined from violating the terms of his employment agreement. However, the remaining Defendants appear to have discontinued their recruitment activities once the requirements of their employment agreements were brought to their attention. The Court therefore concludes that HPA has shown that it should prevail on the merits of its request for injunctive relief as to Russell and McCarty.

### 2. *Substantial Threat of Irreparable Injury*

HPA argues it has suffered irreparable harm from the mass resignation of employees to work for a competing company "including significant damage to HPA's business reputation, goodwill, and ability to procure future business opportunities, as well as the loss of HPA's employees that it has spent significant resources to train." HPA argues that its very survival is at stake. A loss of a business' customers and damage to its goodwill are widely recognized as injuries incapable of ascertainment in monetary terms and may thus be irreparable. *Allied Marketing*

*Grp., Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989). Further, a possibility of loss so great that it threatens business viability can also establish irreparable harm. *See Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.,* 875 F.2d 1174, 1179 (5th Cir. 1989). The hearing testimony provides sufficient evidence that HPA faces damage of the type that the Fifth Circuit has determined to be irreparable.

   *3. Does the threatened injury to HPA outweigh the threatened harm to the defendants*

   Defendants do not argue this element, and it is apparent that the injunctive relief HPA seeks requests would not cause prejudice to Defendants – they would only be required to comply with the terms of the employment agreements they signed. As noted above, HPA believes it will incur substantial losses or not survive at all if Defendants are not enjoined from soliciting Chevron's business for an HPA competitor. It only seeks to bar Defendants from continuing to recruit HPA personnel or assisting a competitor in obtaining Chevron work on the 81B Module. The Court concludes that the threatened harm to HPA outweighs threatened harm to Russell and McCarty.

   *4) That granting the injunction will not disserve the public interest*

   As discussed above, the employment agreements at issue in this case are valid and enforceable under Mississippi law. [T]he public has an interest in not allowing parties to unilaterally breach binding contracts." *Union Nat. Life Ins. Co.*, 143 F. Supp. 2d at 646; *see also Asbury MS Gray-Daniels L.L.C. v. Daniels*, 812 F.

Supp. 2d 771, 783 (S.D. Miss. 2011).  Granting an injunction as to Russell and

McCarty will not disserve the public interest.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Plaintiff's

[14] Amended Motion for Temporary Restraining Order and Preliminary Injunction

is **GRANTED IN PART AND DENIED IN PART**.  The Motion is granted to the

extent that Defendants Garlon M. McCarty and Andrew Russell are enjoined from

a. contacting or soliciting HPA's clients, including Chevron, for the remainder of
their respective 12-month non-competition periods, for the purpose of providing, or
assisting others in providing, products or services that compete with HPA; and

b. directly or indirectly soliciting for employment, hiring, participating in the
recruiting or hiring of, or going into business with HPA's employees, for the
remainder of their respective 18-month periods.

The Motion is **DENIED** in all other respects.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Clerk of Court

may close this case.  A final judgment will be entered.

**SO ORDERED AND ADJUDGED** this the 23rd day of August, 2019.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE